## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RICHARD L. DERRINGER, | : | Case No. 3:16-cv-100 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Richard L. Derringer brings this case challenging the Social Security Administration's denial of his applications for a period of disability, Disability Insurance Benefits, and Supplemental Security Income.  He applied for benefits on November 16, 2012, asserting that he could no longer work a substantial paid job due to advanced right hip osteoarthritis, moderate right sided foraminal acetabular degenerative changes, disorder of the lumbosacral spine, degenerative joint disease with arthritis of the right hip, chronic left AC joint sprain and strain, osteopenia, a depressive order not otherwise specified (NOS), alcohol dependence, and borderline intellectual functioning.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Administrative Law Judge (ALJ) Emily Ruth Statum concluded that he was not eligible for benefits because he is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #14), Plaintiff's Reply (Doc. #15), the administrative record (Doc. #5), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Statum's non-disability decision.

## II.   Background

Plaintiff asserts that he has been under a "disability" since February 28, 2008.  He was thirty-nine years old at that time and was therefore considered a "younger person" under Social Security Regulations.  He has a high school education.

### A.   Plaintiff's Testimony

Plaintiff testified at a hearing before ALJ that he suffers from severe pain in his hips, back, left knee, left collarbone, and ankle.  *Id.* at 107.  He uses a walker that he borrowed from his sister.  *Id.* at 108.  He also borrows a cane sometimes.  *Id.* at 109.  He started using the cane approximately one year before the hearing.  *Id.* at 112.  He is waiting until Medicaid approves it to get his own.  *Id.* at 109.  He is able to walk without assistance but has a bad limp.  *Id.*  He has been limping for four years and it has gotten worse.  *Id.* at 112.  Plaintiff stated that he has difficulty walking on even/level surfaces, and he has to walk at a very slow pace.  *Id.* at 118.  He needs a hip replacement but he

has to wait for insurance.  *Id.* at 113.  His hip causes him pain all the time.  *Id.* at 115.  On a scale from one to ten, the lowest his pain ever goes is a seven and it is typically at a ten. *Id.*  He takes Vicodin for the pain but it does not help.  *Id.*

Plaintiff also has difficulty with his left shoulder/collarbone.  *Id.* at 109-10.  He is not able to reach above shoulder level.  *Id.* at 110.  Although he is a little stiff, he is able to reach in front of him and to the side.  *Id.*  Plaintiff also has problems with his right hip. *Id.* at 111.  It is difficult for him to stand and sometimes, his hip gives out and he loses his balance.  *Id.*

Plaintiff testified that he also has emotional problems because of his pain, a lot of stress, and anxiety.  *Id.* at 107.  Plaintiff sees a psychiatrist who prescribed Lexapro but it does not help.  *Id.*  He is depressed a lot due to all his pain and suffering.  *Id.* at 108. When he is depressed, he tries to get over it, but usually, he just goes outside to smoke. *Id.* at 116.  In addition, he isolates himself from others and has crying spells "every other blue moon."  *Id.*  The combination of depression and pain limits his ability to focus on things.  *Id.* at 117.  For example, he has to focus when taking a bath or tying his shoes. *Id.*  In school, he had ADD [attention deficit disorder] and took special education classes. *Id.* at 108.

Plaintiff last worked in 2008 as a groundkeeper.  *Id.* at 106.  Before that, he did landscaping work for a couple years.  *Id.*  Before landscaping, he installed gutters on and off for over twenty years.  *Id.*

3

Plaintiff lives with his mother. *Id.* at 105. He had a driver's license but it was suspended, and he did not get another one. *Id.* at 106. He does not drink alcohol. *Id.* at 111. During the day, he sometimes reads and looks at pictures in books. *Id.* He has difficulty understanding and remembering when he reads because he has a very short-term memory. *Id.* at 112. However, he cannot sit for very long without experiencing severe and excruciating pain. *Id.* at 111. Once the pain starts, he usually tries to lie down and watch TV. *Id.* He usually watches the Weather Channel. *Id.* at 112. He is most comfortable when he is lying down but can only do so for two to three hours before he has to stand up. *Id.* at 117. He can generally stand for twenty to thirty minutes before he has to sit or lay down. *Id.* at 113-14. He can walk for fifty to one-hundred feet before he has to stop. *Id.* at 114. He can only lift three pounds because his hips are so bad. *Id.* When he lifts something, it causes too much strain and pressures on his hip. *Id.* at 115.

### B. Medical Opinions

#### i. Scott Shaw, M.D.

Dr. Shaw, Plaintiff's primary-care physician, began treating him in October 2013. *Id.* at 860. On April 2, 2014, he completed interrogatories regarding Plaintiff's medical impairments. *Id.* at 860-67. Dr. Shaw treated Plaintiff for hypertension, low back pain, arthralgias, anxiety, and depression. *Id.* at 861. He opined that Plaintiff could not perform the following activities on a regular, sustained basis, in a routine work setting: be prompt and regular in attendance; withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or

4

psychological decompensation or worsening of his impairments; demonstrate reliability; complete a normal workday or workweek without interruption from psychologically-based symptoms and perform at a consistent pace without unreasonable numbers and length of rest periods. *Id.* at 861-62. Dr. Shaw explained that Plaintiff's pain prevents him from being reliable; his anxiety and depression limit performance of duties; and his medical conditions prevent him from physically meeting demands of normal work. *Id.*

Dr. Shaw found that he can frequently lift/carry ten pounds; stand/walk for thirty minutes without interruption for a total of one hour in an eight-hour workday; sit for fifteen minutes without interruption for a total of one hour in an eight-hour workday. *Id.* at 863-84. He indicated these limitations are caused by Plaintiff's right hip problems. *Id.* Additionally, because of Plaintiff's pain and decreased range of motion in his right hip, he can never balance, climb, crawl, crouch, kneel, or stoop. *Id.* at 864-65. His abilities to reach and push/pull are also affected by his right hip disorder. *Id.* at 865.

Dr. Shaw estimated that Plaintiff's impairments would cause him to be absent from work more than three times per month. *Id.* at 867. He concluded that Plaintiff does not have the residual functional ability to perform sedentary or light work on a sustained basis. *Id.*

### ii.  Aivars Vitols, D.O.

Dr. Vitols examined Plaintiff on May 9, 2013. *Id.* at 762. Dr. Vitols noted that Plaintiff presented with a severe antalgic gait, favoring his right lower extremity. *Id.* He was not using an assistive device for ambulation. *Id.* at 763. Dr. Vitols indicated that he

5

had difficulty rising from a seated position, and with his back to Dr. Vitols, he was someone unsteady.  *Id.* at 764.

Upon examination, Dr. Vitols noted tenderness to palpation over Plaintiff's left AC joint and full range of motion in both shoulders.  *Id.*  He did not find evidence of atrophy in his upper extremities.  *Id.*  Plaintiff was able to grasp, manipulate, pinch, and grip with both hands.  *Id.*  He was also able to perform heel-to-toe standing with difficulty.  *Id.*  When seated, Plaintiff had significant restricted painful motion of his right hip with a relative strength at 4/5.  *Id.*

Dr. Vitols diagnosed degenerative joint disease with arthritis in his right hip with painful ankyloses; chronic left AC joint sprain and strain; and hypertension as per his history.  *Id.* at 765.  He opined that Plaintiff's "right hip ankyloses and arthritic changes adversely affect his ability to stand and walk but for brief periods of time.  [Plaintiff's] painful left AC joint impairs his ability to use his left arm in an upward raised position for prolonged periods of time."  *Id.*  He concluded that Plaintiff's "overall capacity level is estimated to be in the light capacity range."  *Id.*

### iii.  Stephen W. Halmi, Psy.D.

Dr. Halmi evaluated Plaintiff on May 17, 2013.  *Id.* at 771-780.  He noted that Plaintiff walked with a noticeable limp and sat with a tense posture at the edge of his seat. *Id.* at 775.  His affect was flat, and he reported symptoms associated with depression.  *Id.* at 776.  Plaintiff maintained adequate attention and concentration throughout the evaluation, scored in the average range on a calculation task, and scored in the low

average range on a short-term memory task.  *Id.* at 776-77.  His recent long-term memory and remote memory were adequate, and his remote memory for the recall of personal dates and events was fair.  *Id.* at 777.  He scored in the moderately impaired range on an abstract reasoning task and mildly impaired on a judgment reasoning task.  *Id.*  Based on previous testing, Dr. Halmi opined that his intellectual abilities rank in the borderline range.  *Id.*

Dr. Halmi diagnosed depressive disorder not otherwise specified (NOS), alcohol dependence, and borderline intellectual functioning.  *Id.* at 777.  He assigned a symptom global assessment of functioning (GAF) score of 65, function GAF score of 70; and overall GAF score of 65.  *Id.* at 778.  Dr. Halmi opined that Plaintiff "may benefit from an antidepressant, but his depression is likely to remain as long as he is abusing alcohol and has no income, as well as chronic pain."  *Id.*  Further, his prognosis is guarded.  *Id.*

Dr. Halmi found, "He is at least capable of learning and performing a low skill level task if motivated."  *Id.* at 779.  He has limited verbal abilities, and "he would have difficulty learning and performing a multiple step task primary because of limited cognitive abilities due to congenital reasons."  *Id.*  He is able to maintain adequate attention, concentration, perseverance, and pace to perform a simple, repetitive, low skill level task.  *Id.*  Dr. Halmi does not have evidence that Plaintiff has significant problems getting along with others based on their interaction.  *Id.* at 780.  However, based on Plaintiff's self-report, Dr. Halmi opined, "he may have intermittent problems getting along with coworkers . . . ."  *Id.*  Additionally, he "would likely have problems getting

along with difficult people because of irritability and limited communication skills. He would likely respond to constructive criticism with defensiveness . . . ." *Id.* If the task is simple and repetitive, Plaintiff "can meet deadlines from a psychological standpoint . . . [and] he could solve the type of novel problems you would find in a low skill level task without significant difficulty." *Id.*

### iv. State Agency Record-Reviewing Physicians & Psychologists

Walter Holbrook, M.D., reviewed Plaintiff's records on May 17, 2011 and found that he had two non-severe impairments: other disorders of the gastrointestinal system and alcohol, substance addiction disorders. *Id.* at 132-36. Dr. Holbrook concluded that he was not disabled. *Id.* at 135.

On May 20, 2012, Mel Zwissler, Ph.D., reviewed Plaintiff's records and found that he had two severe impairments: osteoarthrosis and allied disorders and other and unspecified arthropathies. *Id.* at 144-52. On May 15, 2012, James Caccillo, D.O., reviewed his records and opined Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. *Id.* at 149. His ability to push and/or pull is limited in his left upper extremity and his ability to reach left overhead is limited. *Id.* at 149-50. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and he can never climb ladders, ropes, or scaffolds. *Id.* at 150. He should avoid concentrated exposure to extreme cold and heat and hazards such as

machinery and heights.  *Id.* at 151.  Dr. Caccillo concluded Plaintiff was not disabled.  *Id.* at 152.

Karla Voyten, Ph.D., reviewed Plaintiff's records on May 29, 2013 and found that he had four severe impairments:  osteoarthrosis and allied disorders, affective disorders, borderline intellectual functioning, and alcohol, substance addiction disorders.  *Id.* at 164-180.  Dr. Voyten opined that under the 'B' criteria of the listings, Plaintiff has a mild restriction of activities of daily living and difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  *Id.* at 171.

Further, Dr. Voyten opined Plaintiff was markedly limited in his ability to understand and remember complex instructions and carry out detailed instructions.  *Id.* at 175-76.  He is moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  *Id.* at 176-77.

9

Robert Wysokinski, M.D., reviewed his records on May 22, 2013. *Id.* at 164-80. He agreed with Dr. Caccillo's findings with a few notable exceptions. *Id.* Dr. Wysokinski opined Plaintiff could only stand and/or walk for two hours in an eight-hour workday and his ability to push and/or pull is limited in his right lower extremity. *Id.* at 173. He can never crawl; he does not have reaching limitations; he does not have limitations with extreme cold and heat; and he should avoid all exposure to hazards. *Id.* at 174-75. Dr. Wysokinski concluded that Plaintiff is not disabled. *Id.* at 179.

On July 18, 2013, Leslie Rudy, Ph.D., reviewed Plaintiff's records and found the same impairments as Dr. Voyten. *Id.* at 200-16. She also agreed with Dr. Voyten's findings under the 'B' criteria except that Dr. Rudy found Plaintiff has moderate difficulties in maintaining social functioning. *Id.* at 208. Dr. Rudy affirmed Dr. Voyten's mental residual functional capacity assessment. *Id.* at 212-13

On July 9, 2013, Anahi Ortiz, M.D., reviewed Plaintiff's records and reached the same conclusions as Dr. Wysokinski. *Id.* at 200-16.

## III.    <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from

10

performing a significant paid job—i.e., "substantial gainful activity," in Social Security

lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

      Judicial review of an ALJ's non-disability decision proceeds along two lines:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir.

2007).  Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record

contains evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741

F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard

is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to

support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.

Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a

scintilla of evidence but less than a preponderance . . . ."  *Rogers*, 486 F.3d at 241

(citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

      The other line of judicial inquiry—reviewing the correctness of the ALJ's legal

criteria—may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial

evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    <u>The ALJ's Decision</u>

As noted previously, it fell to ALJ Statum to evaluate the evidence connected to Plaintiff's application for benefits.  She did so by considering each of the five sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.[2] She reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since February 28, 2008.

Step 2:     He has the severe impairments of advanced right hip osteoarthritis, moderate right sided foraminal acetabular degenerative changes, disorder of the lumbosacral spine, degenerative joint disease with arthritis of the right hip, chronic left AC joint sprain and strain, osteopenia, a depressive order not otherwise specified (NOS), alcohol dependence, and borderline intellectual functioning.

Step 3:     He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of sedentary work.  "This individual could lift and/or carry 10 pounds occasionally, sit about 6 hours in an 8 hour workday, stand or walk about 2 hours in an 8 hour workday on even terrain but no more than 20 to 30 minutes at a time, with occasional pushing or pulling on the left with an ability for

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

occasional overhead reaching on the left (which is his dominant extremity), occasional climbing of ramps or stairs, occasional stooping, kneeling, or crouching, no crawling, no climbing of ladders, ropes or scaffolds, avoiding all exposure to hazards such as machinery or heights, with no commercial driving, with an ability for unskilled work that requires understanding and remembering 1 to 2 step tasks with occasional contact with coworkers, supervisors and the public."

Step 4:  He is unable to perform any of his past relevant work.

Step 5:  He could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 71-92).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 92.

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ erred in finding that Plaintiff's impairment did not meet or equal Listing 12.05C and/or Listing 1.02.  He also argues that the ALJ erred in weighing the treating source's opinion and in finding that he was not credible.  The Commissioner maintains that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal a listing, her evaluation of medical opinions, and her assessment of Plaintiff's credibility.

### A.    Listing 12.05C

ALJ Statum found that Plaintiff's borderline intellectual functioning does not meet the requirements of Listing 12.05.  (Doc. #5, *PageID* #80).  Plaintiff contends that his impairments met, or at the very least equaled, Listing 12.05C.  (Doc. #7, *PageID* #967).

13

To meet the listing for intellectual disability, an individual's impairment must satisfy the diagnostic description in the introductory paragraph and any of the four sets of criteria. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00A. Listing 12.05C provides:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>       .    .    .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. § 404, Subpt. P, App. 1, § 12.05C. Thus, a plaintiff seeking to establish an intellectual disability under Listing 12.05C must prove three elements: (1) an IQ score between 60 and 70; (2) a second impairment causing work-related limitations; and (3) subaverage general intellectual functioning with deficits in adaptive functioning that began before age 22. *Id.*

In the present case, the ALJ's discussion of Listing 12.05 was brief:

> [Plaintiff's] borderline intellectual functioning does not meet the requirements of listing 12.05 as [Plaintiff] received a Full Scale score of 71 and Listing 12.05 requires a valid verbal, performance, or full scale I.Q. score of 60 through 70. In addition, the record does not reveal deficits in adaptive functioning initially manifested during the developmental period, as [Plaintiff] can read and write and worked for many years.

14

> Despite his borderline intellectual functioning, [Plaintiff] reported to Dr. Halmi that he travels by bus or gets rides from friends and that he can read, write, calculate basic math, tell time and use the telephone.

(Doc. #5, *PageID* #80).

### *IQ Score*

The ALJ is correct that Plaintiff received a full scale IQ of 71 on the Wechsler Intelligence Scale for Children-Revised. *Id.* at 509. However, the ALJ overlooked or ignored Plaintiff's Verbal IQ score of 69 on the same test. *Id.* "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00(D)(6)(c). Plaintiff's verbal I.Q. score clearly falls into the range required by the listing. Defendant does not contest this element: "The Commissioner acknowledges that Plaintiff received a verbal IQ score of 69 when he was thirteen years old and therefore, had a listing level IQ score." (Doc. #14, *PageID* #992).

### *Additional Impairments*

Plaintiff has also shown that he has other impairments that impose an additional and significant work-related limitation of function. The ALJ's decision itself acknowledges the existence of such limitations. The ALJ found that in addition to Plaintiff's borderline intellectual functioning, his severe impairments included advanced right hip osteoarthritis, moderate right sided foraminal acetabular degenerative changes, disorder of the lumbosacral spine, degenerative joint disease with arthritis of the right

15

hip, chronic left AC joint sprain and strain, osteopenia, a depressive order not otherwise specified (NOS), and alcohol dependence.  (Doc. #5, *PageID* #74).

The ALJ's findings demonstrate that Plaintiff satisfies Listing 12.05C's requirement of an "additional and significant work-related limitation of function."  The Regulations explain, "For paragraph [12.05]C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.,* is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)."  20 C.F.R. § 404, Subpt. P, App. 1, § 12.00(A).  Consequently, the ALJ's determination at Step 2 that Plaintiff had several "severe" impairments under § 404.1520(c) effectively determined that these impairments imposed "additional and significant work-related limitation of function" in satisfaction of Listing 12.05C.

*Adaptive Functioning*

The introductory paragraph of Listing 12.05 requires that the individual show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."  20 C.F.R. § 404, Subpt. P, App. 1, § 12.05.  "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision, at p. 42.  Additionally, "The American Psychiatric

16

Association defines adaptive-skills limitations as 'concurrent deficits or impairments . . .

in at least two of the following areas:  communication, self-care, home living,

social/interpersonal skills, use of community resources, self-direction, functional

academic skills, work, leisure, health, and safety.'"  *Hayes v. Comm'r of Soc. Sec.,* 357 F.

App'x 672, 677 (6th Cir. 2009) (quoting DSM-IV-TR at 49).

The record contains significant evidence of Plaintiff's deficits in adaptive

functioning.  His school records, although somewhat limited, detail his difficulties with

both academics and social skills.  When Plaintiff was in seventh grade, he had difficulty

passing his reading, math, and science classes.  (Doc. #5, *PageID* #509).  After an

evaluation by a school psychologist, he was placed in developmentally handicapped

classes for each.  *Id.*  The psychologist also administered several different tests, including

the Vineyard Social Maturity Scale, the result of which placed Plaintiff's age equivalency

at 11.5 years old.  *Id.* at 510.

Plaintiff was re-evaluated when he was seventeen years old.  *Id.* at 522.  The

Woodcock-Johnson Psycho-Educational Battery showed Plaintiff lagging far behind:  his

reading grade equivalent was 4.9, math grade equivalent was 6.0, and written language

grade equivalent was 5.5.  *Id.*  On the Vineyard Social Maturity Scale, his social age

score was 9.7 years.  *Id.* at 523.  The psychologist found that Plaintiff's levels of

intellectual and adaptive functioning were within the developmentally handicapped

range.  *Id.* at 524.  She noted that he worked slowly, and his assignments would need to

be shortened and simplified or he would need additional time to complete them.  *Id.*  She

17

recommended that his teacher determine which concepts were essential, and then limit his education to those alone. *Id.* Additionally, he would "need extra explanations of concepts for adequate comprehension and retention." *Id.*

In April 1986, his individualized education plan (IEP) indicated that he was "weak in socialization, communication, [and] daily living skills." *Id.* at 527. In April 1987, his IEP revealed that he was reading at an eighth-grade level and doing math at sixth-grade level. *Id.* at 516.

Dr. Halmi, the evaluating psychologist, noted that Plaintiff repeated first grade because of poor academic performance, he earned failing to average grades, and he had occasional problems getting along with classmates and teachers. *Id.* at 773. Additionally, Plaintiff reported that he was enrolled in the twelfth grade but did not graduate. *Id.* at 774.

Defendant asserts that Plaintiff's work history spanned more than twenty years and included semi-skilled jobs. (Doc. #14, *PageID* #993). Further, Defendant contends that he "engaged in activities that were inconsistent with his claims that he had an intellectual disability." *Id.* For example, Plaintiff takes care of his personal needs, does light chores, had a driver's license (before it was suspended), uses public transportation, and socializes with friends and family. *Id.*

These activities, however, are not inconsistent with an intellectual disability. In *Brown v. Sec'y of Health & Human Servs.,* the plaintiff was able to use public transportation, make change at the grocery, do his own laundry, and clean his room. 948

18

F.2d 268, 270 (6th Cir. 1991).  Additionally, he had a driver's license, and when he was

employed as a truck driver, he was able to record mileage, the hours he worked, and the

places he drove.  *Id.*  The Sixth Circuit found that these activities were not inconsistent

with a valid I.Q. of 68 . . . ."  *Id.*  The Court noted that individuals with mild mental

retardation[3], "[b]y their late teens . . . can acquire academic skills up to approximately

sixth-grade level; during their adult years, they usually achieve social and vocational

skills adequate for minimum self-support, but may need guidance and assistance when

under unusual social or economic stress.  At the present time, *virtually all people with*

*Mild Mental Retardation can live successfully in the community, independently* or in

supervised apartments or group homes (unless there is an associated disorder that makes

this impossible).  *Id.* (emphasis in original) (citing DSM-III-R § 317.00).

The evidence in the record shows that Plaintiff's adaptive abilities/deficiencies are

similar to those in *Brown*.  Plaintiff's psychological evaluations and therapists' treatment

notes document some of these deficiencies.  For example, Plaintiff told his therapist,

Elizabeth A. Roode, MS, PC-CR, CDCA, "[h]e has been 'floating' around between

homes since his wife passed [in] 2002, and admits even they floated around homes

sometimes living with family and sometimes having their own place."  (Doc. #5, *PageID*

#894).  In October 2014, he reported staying in garages, his girlfriend's car, and various

family member's homes.  *Id.* at 943.

---

[3] Intellectual disability under Listing 12.05 was previously referred to as mental retardation.

Although Plaintiff had some success with employment, he has also experienced some trouble. Dr. Halmi noted that he worked as a groundkeeper but was transferred because he was "incompetent." *Id.* at 774. Further, he was fired from a job at a grocery store because he took food off the shelves and ate it. *Id.* He had some problems with his coworkers, and he was in a physical fight at work once. *Id.* at 775.

The record also illustrates Plaintiff's memory and understanding limitations. Plaintiff testified that he has problems remembering what he reads and that he has a very short-term memory. *Id.* at 112. He also testified that he has a hard time focusing on taking a bath or tying his shoes. *Id.* at 117. Dr. Halmi noted that it took Plaintiff three times to successfully repeat four of four objects immediately after presentation, and when asked to identify those four objects five minutes later, he recalled three without assistance but could not recall the fourth object despite the assistance of a category prompt and multiple choice list. *Id.* at 776-77. He was able to recall what he ate for dinner the day before and what he last watched on television, but he could not identify a contemporary news item. *Id.* at 777.

Dr. Voyten and Dr. Rudy, the State agency record-reviewing physicians, opined that he was markedly limited in his abilities to understand and remember detailed instructions and to carry out detailed instructions. *Id.* at 175-76, 212. They also found that he was moderately limited in many areas, including his abilities to maintain attention and concentration for extended periods, make simple work-related decisions, interact

20

with the general public, and respond appropriately to changes in the work setting.  *Id.* at 176-77, 212-13.

Together, this evidence shows Plaintiff's significant deficits in adaptive functioning as Listing 12.05C requires.

For the above reasons, Plaintiff's Statement of Errors is well taken.[4]

### B.      Judicial Award of Benefits

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F.3d at 746.  Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award

---

[4] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

of benefits.  *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994).  The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking."  *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Human Servs*., 17 F.3d 171, 176 (6th Cir. 1994).

In the present case, the evidence of record establishes that a remand for award of benefits is warranted because the record contains overwhelming evidence, or strong evidence while contrary evidence is lacking, that Plaintiff met the criteria of Listing 12.05C.  But, the question of when his benefits begin remains.  Plaintiff previously applied for Disability Insurance Benefits on March 23, 2012.  His application was ultimately denied upon reconsideration on May 29, 2012, he did not appeal, and the record does not reveal any new or material evidence.  As a result, the Social Security Administration's determination of May 29, 2012 is a final determination that Plaintiff was not eligible for Disability Insurance Benefits from February 28, 2008 through May 29, 2012.  (Doc. #5, *PageID* #71).  Therefore, Plaintiff became eligible for Disability Insurance Benefits on May 30, 2012, and became eligible for Supplemental Security Income on the day he filed his application, November 16, 2012.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be reversed and this case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for payment of benefits; and

      2.      The case be terminated on the docket of this Court.

Date: <u>February 6, 2017</u>                  <u>*s/Sharon L. Ovington*</u>
                                                Sharon L. Ovington
                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).